COMMONWEALTH *vs.* DION L. STOUTE.

Suffolk. April 4, 1996. - May 30, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Search and Seizure,* Pursuit, Threshold police inquiry. *Constitutional Law,* Search and seizure. *Words,* "Seized."

For purposes of art. 14 of the Declaration of Rights of the Massachusetts Constitution, a person is "seized" when a police officer initiates a pursuit with the obvious intent of requiring the person to submit to questioning, that is, when a person's personal liberty has been significantly restrained by the police. [785-789]

At a hearing on a criminal defendant's motion to suppress evidence, the judge correctly concluded that police officers acted reasonably in initiating an investigatory stop of the defendant and had an objectively reasonable suspicion of criminal activity to justify their pursuit of the defendant as he bicycled away from them: a white plastic bag containing a white powder discarded by the defendant as he vaulted a fence was properly admissible in evidence. [789-791]

INDICTMENTS found and returned in the Superior Court Department on September 9, 1991.

A pretrial motion to suppress evidence was heard by *Robert A. Mulligan,* J., and the cases were tried before *Barbara J. Rouse,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Dennis M. Powers* for the defendant.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. We transferred the appeal of the defendant, Dion L. Stoute, to this court on our own motion to decide whether, under art. 14 of the Declaration of Rights of the Massachusetts Constitution, a person is "seized" when a police officer engages in pursuit which is intended to stop and detain the person for inquiry or whether a seizure occurs only when the person is physically detained by a police officer. We

conclude that a person is seized, for purposes of art. 14, when a police officer initiates a pursuit with the obvious intent of requiring the person to submit to questioning.

The defendant was convicted by a jury in the Superior Court of trafficking in cocaine, in violation of G. L. c. 94C, § 32E (1990 ed.), and for possession of marihuana, in violation of G. L. c. 94C, § 34 (1994 ed.). Prior to trial, he moved to suppress drugs seized by the police. Following an evidentiary hearing, a judge in the Superior Court denied the motion, and the correctness of that ruling is the only issue raised on appeal. We conclude that the motion to suppress was properly denied and affirm the judgments of conviction.

In his written memorandum of decision, the judge recited the following facts.[1] Around 10:45 P.M. on July 22, 1991, two Boston police officers, accompanied by a State trooper, all in plain clothes, left the parking lot of the police station in the Roxbury section of Boston in an unmarked Crown Victoria automobile. A short distance from the parking lot, the driver of the vehicle noticed a group of young people, most of them female, in front of a sandwich shop. Two young men on bicycles, one dressed in a black sweatshirt with a hood over his head, were passing the sandwich shop, heading toward the vehicle. The area is one with a "very high" rate of crime.[2] As the automobile passed the group of girls, one of them[3] yelled that the boy in the "hoody" (vernacular term for

---

[1]The facts, as found by the judge, are fully supported in the transcript of the hearing on the defendant's motion to suppress, and the defendant does not argue otherwise. See *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990). "[W]e make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986), quoting *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977).

[2]At the hearing on the motion to suppress, one of the officers testified that he had made arrests in the area for "[j]ust about every felony [he could] think of . . . for armed robbery, possession of firearms, drug arrests, rapes, robberies." The other officer testified that he was familiar with the area as a "very high crime area," and that he had made arrests for "numerous felon[ies] . . . drug arrests, gun arrests, shootings, stolen cars."

[3]The judge's findings indicate that one of the girls yelled information to the police about a gun. The police officers' testimony at the hearing on the motion to suppress seems to indicate that more than one person in the group attempted to transmit the information to the police, and that the statement was made more than once.

hooded sweatshirt) had a gun.[4] The driver turned the automobile around, and followed the two young men, simultaneously informing the other officers of what he had heard. When the automobile pulled alongside the young men, the police officer in the passenger seat said, "Police, hold up a minute." The individual in the black sweatshirt stopped and raised his hands over his head. The trooper got out of the back seat of the vehicle and rapidly frisked this young man. Nothing was found.

The other bicyclist (the defendant) continued to ride down the street at an increased rate of speed. As soon as the police officers ascertained that the trooper had not found a firearm, they followed the defendant and again pulled up alongside of him. Officer Murphy, the passenger, recognized the defendant as someone with whom he had spoken in the past. The defendant had always been cooperative and respectful with the police. Officer Murphy again asked the defendant to stop. Instead of obeying the command, the defendant rode his bicycle onto the sidewalk, jumped off it, and ran in the direction opposite to the one in which he had been riding. Officer Murphy left the automobile and pursued the defendant, who ran a short distance before vaulting over a fence, simultaneously discarding a white plastic bag. The defendant landed on his back and did not get up. Officer Murphy jumped over the fence and physically detained the defendant. The package, retrieved by the police officers, contained white powder, presumed (correctly as it turned out) to be cocaine. The defendant was placed under arrest for the unlawful possession of a controlled substance. When he was searched in connection with his arrest, marihuana was found on his person.

1. The defendant concedes that the decision of the United States Supreme Court in *California* v. *Hodari D.*, 499 U.S. 621 (1991), forecloses any argument that the Fourth Amendment to the United States Constitution requires suppression of the evidence. In the *Hodari D.* case, a majority of the Court rejected the claim that a person is "seized," for the

---

[4]At the hearing on the motion to suppress, the police officer who had been driving the automobile speculated that members of the group in front of the sandwich shop would have recognized a Crown Victoria automobile occupied by three white men as an unmarked police vehicle. In addition, he noted that the group might have seen the automobile pull out of the police station parking lot.

purpose of the Fourth Amendment, when a police officer commences a pursuit of the person in circumstances indicating an obvious intention on the part of the police officer to detain the person for questioning. Instead, the Court concluded, a person is seized only when a police officer with lawful authority actually lays hands on, and manages to detain, the person.[5] See *id.* at 624. As the defendant acknowledges, under the reasoning in the *Hodari D.* decision, he was not seized until Officer Murphy jumped over the fence and physically detained him. Thus, the package that the defendant discarded during the pursuit was abandoned by him before he was seized, and its retrieval was not the fruit of an illegal seizure effected without reasonable suspicion or probable cause. See *id.* at 629.

2. We turn, therefore, to a question to which we have recently alluded, see *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 386-387, cert. denied, 115 S. Ct. 2588 (1995): whether art. 14[6] provides more substantive protection to a person than does the Fourth Amendment in defining the moment at which a person's personal liberty has been signifi-

---

[5]The only issue we are concerned with in this case is whether a seizure occurs when a person declines to submit to an official show of authority by engaging in flight. Of course, a person also may be seized in a constitutional sense when, having been accosted by law enforcement officials, he remains and responds to a police officer's inquiries. In those circumstances, the question of seizure turns in large part on whether a reasonable person would have felt free to terminate the interview with law enforcement officials. See *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 387, cert. denied, 115 S. Ct. 2588 (1995).

[6]Article 14 of the Declaration of Rights of the Massachusetts Constitution, adopted in 1780, reads as follows:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the law."

cantly restrained by the police, so that he may be said to have been "seized" within the meaning of art. 14.[7]

"Massachusetts courts have adhered to the test set forth in the *Mendenhall-Royer* line of cases [*Florida* v. *Royer*, 460 U.S. 491 (1983); *United States* v. *Mendenhall*, 446 U.S. 544 (1980)] decided prior to *Hodari D.* as the proper analysis whether a seizure has occurred under art. 14 of the Massachusetts Constitution." *Commonwealth* v. *Thinh Van Cao, supra* at 387. See *Commonwealth* v. *Willis*, 415 Mass. 814, 817 n.4 (1993). That analysis provides that a person is "seized" by a police officer "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985), quoting *United States* v. *Mendenhall, supra* at 554. See *Commonwealth* v. *Thinh Van Cao, supra*; *Commonwealth* v. *Fraser*, 410 Mass. 541, 543 (1991).[8] The *Hodari D.* decision represents a revision of the United States Supreme Court's definition of seizure, see *Commonwealth* v. *Thinh Van Cao, supra* at 386, as well as a departure from that Court's precedent. See *California* v. *Hodari D., supra* at 629-642 (Stevens, J., dissenting). We implied in the *Thinh Van Cao* opinion that we might not accept this revised definition of the term "seizure," which has been widely

---

[7]We reject the Commonwealth's contention that the defendant has failed to preserve the art. 14 issue. The judge plainly considered the question of art. 14 to be before him, since he addressed that point in his memorandum of decision. The defendant's brief contains an adequate, if not exhaustive, argument on the point, with citation to relevant authority. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Commonwealth* v. *Williams, ante* 111, 115 n.9 (1996) (when defendant cites State and Federal cases in support of claim, court usually analyzes case under both art. 14 and Fourth Amendment).

[8]The definition of the term "seizure" has been phrased in various ways. In *Terry* v. *Ohio*, 392 U.S. 1, 19 n.16 (1968), the United States Supreme Court defined "seizure" as the situation "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." In *Florida* v. *Bostick,* 501 U.S. 429, 436 (1991), discussing seizure when circumstances other than the presence of law enforcement officials constrain a person's freedom of movement, the Court held that the "appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests [for information] or otherwise terminate the encounter."

criticized,[9] for the purpose of art. 14 analysis.[10] See *State* v. *Oquendo*, 223 Conn. 635, 651 (1992) (rejecting reasoning in *Hodari D.* decision on basis of State Constitution); *State* v. *Quino*, 74 Haw. 161, 170 (1992) (same), cert. denied, 507 U.S. 1031 (1993); *Matter of Welfare of E.D.J.*, 502 N.W.2d 779 (Minn. 1993) (same); *State* v. *Tucker*, 136 N.J. 158, 165 (1994) (same); *People* v. *Hollman*, 79 N.Y.2d 181, 195-196 (1992) (same); *Commonwealth* v. *Matos*, 672 A.2d 769 (Pa. 1996) (same).[11]

The majority's decision in the *Hodari D.* case rejected the assertion that pursuit could be a seizure in constitutional terms by reference to the common law definition of arrest (equating "seizure" with "arrest"),[12] and by observing that, as matter of policy, it would be unwise to reward a flight from the police by the exclusion of evidence discarded during the flight. We have on occasion invoked common law principles to construe the language of art. 14, see *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221, 231-233 & n.20 (1993), but we have never suggested, nor could we properly suggest, that the strictures of the common law should operate

---

[9]See, e.g., Bacigal, The Right of the People to be Secure, 82 Ky. L.J. 145 (1993); Clancy, The Future of Fourth Amendment Seizure Analysis After *Hodari D.* and *Bostick*, 28 Am. Crim. L. Rev. 799, 834-842 (1991); Green, "Power, Not Reason": Justice Marshall's Valedictory and the Fourth Amendment in the Supreme Court's 1990 Term, 70 N.C.L. Rev. 373, 400-404 (1992); 4 W.R. LaFave, Search and Seizure § 9.3 (d) (3d ed. 1996).

[10]"It is by now firmly established that, in some circumstances, art. 14 affords greater protection against arbitrary government action than do the cognate provisions of the Fourth Amendment." *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221, 229 n.16 (1993).

[11]Noting that Nebraska has no history of affording individuals greater rights on the basis of the State Constitution than are afforded by the United States Constitution, the Court of Appeals of Nebraska adopted the principles in the *Hodari D.* decision for the purposes of the Nebraska Constitution. See *State* v. *Cronin*, 2 Neb. App. 368, 373 (1993). See also *State* v. *West*, 119 N.C. App. 562, 566 (1995).

[12]In his dissenting opinion, Justice Stevens took issue with the majority's explanation of the common law as incomplete, noting that "the facts of this case . . . describe . . . an unlawful attempt to take a presumptively innocent person into custody," *California* v. *Hodari D.*, 499 U.S. 621, 631 (1991) (Stevens, J., dissenting), which was unlawful at common law. Thus, assuming that the scope of Fourth Amendment protections should be defined by reference to the common law, the proper reference point was the common law of attempted arrest rather than the common law of arrest. *Id.* at 631-632.

to diminish the protection from abuse of official power that art. 14 was intended to afford to the citizens of the Commonwealth.[13] See *id.* at 230 (art. 14 was a response to "unchecked control over the liberty of the people" inherent in British Crown's general warrants and writs of assistance). See also *Commonwealth* v. *Ford,* 394 Mass. 421, 426 (1985) (art. 14 requires exclusion of evidence seized in violation of constitutional rights); *Commonwealth* v. *Upton,* 394 Mass. 363, 365 (1985) (common law of Massachusetts did not mandate exclusion of illegally obtained evidence).

Moreover, we do not write on a blank slate on the question of police pursuit as an assertion of governmental authority having constitutional implications. In *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981), we considered a case involving facts similar to those recited in the *Hodari D.* decision. The defendant in the *Thibeau* case was riding a bicycle in the Jamaica Plain section of Boston around 10 P.M. in August, 1979. Two police vehicles, one of them marked, pulled up alongside him. The defendant looked at the marked cruiser, turned sharply to his left, and pedalled away. Using his siren, the officer in the unmarked cruiser pursued the defendant, ultimately reaching out, grabbing him, and forcing him to the sidewalk. During the ensuing search of the defendant's person, the officer discovered narcotics. *Id.* at 763. Clearly, the officer had no specific and articulable facts on which to base a reasonable suspicion of criminal activity before he commenced his pursuit of the defendant. *Id.* at 763-764. Thus, the question in the *Thibeau* case was whether evidence attributable to the pursuit had been obtained as a result of an unconstitutional "seizure."

We stated in the *Thibeau* decision that "[s]tops[14] provoke constitutional scrutiny because they encumber [a person's] freedom of movement. Pursuit that appears designed to effect

---

[13]Nor, prior to the *Hodari D.* decision, had it been thought that the United States Supreme Court regarded the common law as the decisive source in the search for the meaning of the words in the Fourth Amendment. See *California* v. *Hodari D., supra* at 629 (Stevens, J., dissenting); *Katz* v. *United States,* 389 U.S. 347 (1967).

[14]A stop is, of course, a form of seizure in the constitutional sense, see, e.g., *Commonwealth* v. *Mercado, ante* 367, 369 (1996), predicated on *Terry* v. *Ohio,* 392 U.S. 1 (1968), and its progeny.

a stop is no less intrusive than a stop itself."[15] *Id.* at 764. Framed slightly differently, a pursuit, which, objectively considered, indicates to a person that he would not be free to leave the area (or to remain there) without first responding to a police officer's inquiry, is the functional equivalent of a seizure, in the sense that the person being pursued is plainly the object of an official assertion of authority, which does not intend to be denied, and which infringes considerably on the person's freedom of action. See 4 W.R. LaFave, Search and Seizure § 9.3(d), at 127-128 (3d ed. 1996). On the basis of art. 14, we adhere to the view expressed in the *Thibeau* decision, which is shared by the New York Court of Appeals, see *People* v. *Martinez*, 80 N.Y.2d 444, 446-447 (1992), that unless an officer has a reasonable suspicion to justify this type of pursuit, any evidence obtained as a result of it must be suppressed. "Were the rule otherwise, the police could turn a hunch into a reasonable suspicion by inducing the conduct [flight or the abandonment of potential evidence] justifying the suspicion." *Commonwealth* v. *Thibeau, supra* at 764.

3. We turn now to the remaining related issues presented in this case: when the pursuit of the defendant began and whether, at that point, the officers had an objectively reasonable suspicion of criminal activity, based on specific and articulable facts, to justify that pursuit. See *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968).

Agreeing that not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification, see *Commonwealth* v. *Leonard*, ante 504 (1996); *Commonwealth* v. *Sanchez*, 403 Mass. 640, 644 (1988), the defendant in his brief does not dispute the judge's conclusion that no *Terry*-type stop occurred when Officer Murphy initially asked the defendant and his companion to "hold up a minute." See

[15]The basis for the decision in *Commonwealth* v. *Thibeau*, 384 Mass. 762 (1981) — Fourth Amendment or art. 14 — was not specified. More recently, without extended discussion, we stated that "[p]ursuit for constitutional purposes began when the officers left the police cruiser and began to chase the suspects on foot. At this time, the police were attempting to stop the defendant to effectuate a threshold inquiry." *Commonwealth* v. *Williams, supra* at 117. We went on to observe that the police had the requisite reasonable suspicion before the pursuit began, thus implicitly adhering to the view expressed in the *Thibeau* decision that, in many circumstances, a pursuit is a seizure for constitutional purposes.

*Commonwealth* v. *Fraser,* 410 Mass. 541, 543 (1991) (police officer did not seize defendant by approaching him, identifying himself as police officer and asking defendant to take his hands out of his pockets). See also *Commonwealth* v. *Wedderburn,* 36 Mass. App. Ct. 558, 561 (1994) (no seizure when defendant, who left scene as unmarked cruiser approached, evidently felt free to leave). The defendant contends that pursuit in a constitutional sense commenced when the officers, having left the trooper behind with the defendant's companion, followed the defendant on his bicycle, and further contends that the police officers lacked reasonable suspicion at that point for their focus on the defendant. We need not decide whether pursuit commenced when the officers drove after the defendant, or (a more likely alternative) when Officer Murphy made his second request to the defendant to stop, because we conclude that, once it was known that the defendant's companion was not carrying a firearm, the officers had reasonable suspicion to stop the defendant for the purpose of conducting a threshold inquiry.

In determining whether an officer acts reasonably in initiating a threshold, or investigatory, stop, we view the circumstances as a whole, see *Commonwealth* v. *Williams, ante* 111, 116 (1996), and consider the "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry* v. *Ohio, supra* at 27. "Reasonable suspicion depends upon the content of the information possessed and its degree of reliability." *United States* v. *Bold,* 19 F.3d 99, 102 (2d Cir. 1994). Tips from informants must be evaluated by reference to their reliability and the probable basis of knowledge of the informant. See K.B. Smith, Criminal Practice and Procedure § 306 (1983 & Supp. 1996). When a tip, such as the one received here, concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials. See *Commonwealth* v. *Fraser, supra* at 544-545 n.4.

The police officers, who knew from personal experience that they were in a very high crime area in which crimes often had been committed with firearms, could have inferred that the young woman (or women, see note 3, *supra*) who shouted at them had personal knowledge that the defendant's companion had a gun. See *Commonwealth* v. *Anderson,* 366 Mass. 394, 399 (1974). The information was provided by

bystanders who could have been identified, thus reducing to some extent the likelihood of fabrication. See *Commonwealth* v. *Atchue*, 393 Mass. 343, 347-349 (1984). As the judge observed, the police officers briefly lost sight of the two bicyclists after the bicyclists (and one of the police officers) had heard the shouted comment. At this point, as the judge found, the defendant's companion would have had an opportunity, as well as a reason, to hand a gun off to the defendant. Once the trooper's frisk of the companion established that he did not possess a weapon, the police officers reasonably could have suspected that the gun was in the defendant's possession. The defendant's failure to stop at Officer Murphy's request, and his accelerated pace as he drew away from the officers, could have contributed to that suspicion. See *Commonwealth* v. *Moses*, 408 Mass. 136, 140 (1990); *Commonwealth* v. *Sanchez, supra* at 644-645. Particularly when a police officer receives information concerning an individual with a gun, the "test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation." *United States* v. *Bold, supra* at 104. The facts known to the officers were sufficient to justify their approach to the defendant for a threshold inquiry.

*Judgments affirmed.*